IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


BLUE MOON FIDUCIARY, LLC,          )
individually and as fiduciary      )
to the G FIDUCIARY RETIREMENT      )
INCOME SECURITY PLAN,              )
BENEFITGUARD 401(K) PLAN, and      )
NATIONAL RETIREMENT SECURITY       )
PLAN 401(K),                       )
                                   )
DAVID J. NOVAK, D.D.S., P.A.,      )
individually and as fiduciary      )
to the G FIDUCIARY RETIREMENT      )
INCOME SECURITY PLAN               )
BENEFITGUARD 401(K) PLAN, and      )
NATIONAL RETIREMENT SECURITY       )
PLAN 401(K), and                   )
                                   )
DAVID J. NOVAK, a participant      )
in the G FIDUCIARY RETIREMENT      )
INCOME SECURITY PLAN,              )
BENEFITGUARD 401(K) PLAN, and      )
NATIONAL RETIREMENT SECURITY       )
PLAN 401(K),                       )
                                   )
                Plaintiffs,        )
                                   )
        v.                         )          1:12CV78
                                   )
MATTHEW D. HUTCHESON,              )
MATTHEW D. HUTCHESON, LLC,         )
G FIDUCIARY, LLC, n/k/a            )
BENEFITGUARD, LLC,                 )
BENEFITGUARD, LLC, AARON           )
GABBART, DANIEL S. PETERSON,       )
ASPIRE FINANCIAL SERVICES, LLC,    )
f/k/a 401K ASP, LLC, NATIONAL      )
RETIREMENT SECURITY PLAN, LLC,     )
ERISA WISE, LLC, STEPHANIE A.      )
BANISTER, DENNIS HURSH,            )
HUTCHESON WALKER ADVISORS,         )
LLC, and ARY ROSENBAUM,            )
                                   )
                Defendants.        )

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

This case arises primarily from Defendant Matthew D. Hutcheson's misappropriation of certain retirement plan assets ("Novak Plan Assets") belonging to the North Carolina employees and plan participants of David J. Novak, D.D.S. ("Novak Employer")[1]. (First Amended Complaint ("Am. Compl.") (Doc. 91) ¶ 1.) As explained in further detail below, Plaintiffs allege that each Defendant in this case had various obligations to act responsibly with respect to the Novak Plan Assets entrusted to them by Novak Employer, and that they failed to do so in violation of North Carolina state law and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq.

Presently pending and ripe for ruling is the Motion to Dismiss Plaintiffs' Unfair and Deceptive Trade Practices Claim filed by Defendants Aaron Gabbart, Daniel S. Peterson, and BenefitGuard, LLC (Doc. 94), and the Motion to Dismiss filed by

---

[1] At the time this case was filed, Defendant Hutcheson had been indicted by a federal grand jury on seventeen counts of wire fraud and fourteen counts of theft from the employee pension benefit plans at issue in this case. (Am. Compl. (Doc. 91) ¶ 143.) He was found guilty of seventeen counts of wire fraud on April 15, 2013, and sentenced on July 31, 2013. United States v. Hutcheson, No. 1:12CR00093-WFN-1 (D. Idaho July 31, 2013).

Defendant Aspire Financial Services (Doc. 105). Because of the sheer number of facts and claims alleged, this court has elected to deal with these motions in separate orders, incorporating the overlapping facts and legal analysis by reference into each opinion. This first order deals with Defendants Aaron Gabbart, Daniel Peterson, and BenefitGuard, LLC ("BenefitGuard Defendants"), and the second deals with Defendant Aspire.

## I.    LEGAL STANDARD

Each set of Defendants moves to dismiss a portion of Plaintiffs' Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). To survive a Rule 12(b)(6) motion, a plaintiff must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  For a claim to be facially plausible, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable" and must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." Id. (citing Twombly, 550 U.S. at 556).  When ruling on a Rule 12(b)(6) motion, a court must accept the complaint's factual allegations as true. Id.  However, a court does not have to accept as true mere legal conclusions, and "[t]hreadbare

recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555).

## II. **GENERAL FACTUAL BACKGROUND**

Before addressing the facts specific to the BenefitGuard Defendants, this court will set out the background facts common to all defendants, as described in the Amended Complaint.[2]

Novak Employer is a North Carolina professional corporation engaged in the practice of dentistry, with its principal place of business located in High Point, North Carolina. (Am. Compl. (Doc. 91) at ¶ 9.) Initially, Novak Employer sponsored its own single-employer retirement plan, but eventually decided to place its assets into a series of multiple-employer retirement plans ("MEPs").[3] (Id. ¶ 3.)  Plaintiff Blue Moon Fiduciary, LLC ("Blue Moon") served in a fiduciary capacity with respect to the Novak Plan Assets ¶ 35), and continued to serve as a "monitoring

---

[2] This general factual background is applicable to all Defendants and incorporated by reference in the other order relating to this case.

[3] MEPs are designed to allow multiple employers to pool their assets and minimize administrative costs while providing ERISA-compliant retirement benefits. (Id. ¶ 4.) This memo will continue to use the term "Novak Plan Assets" to refer to the portion of the assets in each MEP belonging to Novak Employer.

fiduciary" for the Novak Plan Assets transferred to the various

MEPs at issue in this case (id. ¶ 42).

Around November 7, 2008, Novak Employer decided to join the

G Fiduciary Retirement Income Security Plan ("G Plan"), an MEP

for which Defendant Hutcheson was a named fiduciary and trustee.

(Id. ¶ 11.) The G Plan was sponsored by Defendant G Fiduciary,

LLC (id. ¶ 37), and Defendant Aspire Financial Services

("Aspire") was the Plan's recordkeeper, responsible for

providing participating employers and employees with accurate

information regarding account balance information, the location

of participants' assets, and investment performance. (Id. ¶ 40.)

Between January 29, 2009 and July 30, 2009, Novak Employer

transferred $158,010.69 of Novak Plan Assets into the G Plan

account. (Id. ¶ 38.)

At various times between January and December 2010,

Defendant Hutcheson directed Defendant Aspire to make twelve

wire transfers totaling $2,031,688 from the G Plan to various

destinations.[4] (Id. ¶¶ 44-45.) Ultimately, Hutcheson used the

money to renovate his house, buy automobiles and motorcycles,

---

[4] According to the complaint, eleven of the twelve transfers were made to a West Coast Bank account maintained by Hutcheson in the name of Pension Liquidity Plan & Trust. (Id. ¶ 45.) The other transfer was made to an account at the First National Bank of Omaha. (Id.)

and repay personal loans, among other things. (Id. ¶ 47.) In addition, on or around December 15, 2010, Blue Moon employee Deborah Aboudara ("Aboudara") checked the Aspire website and discovered that the Novak Plan Assets were invested entirely in stocks (id. ¶ 62), in violation of the Novak Plan investment policy calling for an allocation of sixty percent (60%) stocks and forty percent (40%) bonds. (Id. ¶ 41.)

Meanwhile, in late July 2010, before Novak Employer or Blue Moon had any knowledge of Hutcheson's activities, Defendant Daniel S. Peterson ("Peterson"), a G Plan administrator (id. ¶ 16), told Aboudara that the G Plan had changed its name to the BenefitGuard 401(k) Plan ("BenefitGuard Plan"). (Id. ¶ 48.) Defendant Peterson also told Aboudara that Aspire was no longer going to serve as recordkeeper for the G Plan, but that he did not know which entity would replace Aspire in that role. (Id. ¶ 50.) In December 2010, Defendant Aaron Gabbart ("Gabbart"), another G Plan fiduciary, told Aboudara that it was time to transition the Novak Plan Assets from the G Plan to the BenefitGuard Plan, and that all retirement contributions should thereafter be made through Capital Plan Services, which had apparently been chosen as the BenefitGuard Plan's recordkeeper in the interim. (Id. ¶ 51.) Novak Employer made its final contribution to the G Plan in mid-January 2011, in the amount of

$5,351.98 (id. ¶ 64), and whatever Novak Plan Assets remained in the G Plan after Hutcheson's embezzlement were transferred to the BenefitGuard Plan. (Id. ¶ 66.) After that date, Novak Employer deposited the Novak Plan contributions with the BenefitGuard Plan in accordance with Gabbart's instructions. (Id.)

In March 2011, Hutcheson, who was also a fiduciary of the BenefitGuard Plan, e-mailed Aboudara and made several disapproving remarks about the BenefitGuard Plan and its managers. (Id. ¶ 67.) Hutcheson also advised Aboudara that Novak Employer should cease to communicate with anyone but Hutcheson about the Novak Plan Assets, and that it should move the assets from the BenefitGuard Plan to a third MEP, the National Retirement Security Plan 401(k) ("NRSP 401(k)"), for which Hutcheson also served as a fiduciary. (Id. ¶ 69.) According to the Amended Complaint, Hutcheson made this request in order to obtain additional fees and assets for his personal benefit and to delay Novak Employer's discovery of his 2010 misappropriation of G Plan assets. (Id. ¶ 68.) In reliance on Hutcheson's assurances, and because Defendants Peterson, Gabbart, and BenefitGuard had not disclosed Hutcheson's prior embezzlement, Novak Employer agreed to transfer its retirement plan assets from the BenefitGuard Plan to the NRSP 401(k). (Id. ¶ 71.)

Hutcheson facilitated the transfer and advised Plaintiffs to communicate only with him or one of his employees, John Fitzgerald, and to stop all communication with Peterson and Gabbart. (Id.)

Also around March 2011, while attempting to obtain the distribution of retirement assets to two Novak Plan participants, Blue Moon received contradictory information regarding the location of the Novak Plan Assets. (Id. ¶ 74.) Specifically, Blue Moon could not determine whether the funds were located in any of the three aforementioned MEPs, whether they were in the custody of Charles Schwab Bank or TD Ameritrade, or whether they were in Hutcheson's possession. (Id.)

In May 2011, Defendant Peterson e-mailed Hutcheson requesting that Hutcheson provide information about the G Plan funds he had withdrawn the previous year, including the location of the assets and the contact information of anyone who could help facilitate their return to the proper MEP. (Id. ¶ 75.) Peterson did not, however, inform Plaintiffs of this request, or the fact that Hutcheson had removed G Plan funds in the first place. (See id. ¶ 57.) Aboudara, whose suspicions were aroused by the conflicting information, questioned Hutcheson, but Hutcheson deflected her queries by stating that the ongoing

transition from the BenefitGuard Plan to the NRSP 401(k) prevented a full accounting of Novak Plan Assets. (Id. ¶ 79.) In July 2011, however, Trautmann Maher, the recordkeeper for the NRSP 401(k), received a wire transfer of $40,000 (including $4,960.89 of Novak Plan Assets originally attributable to the G Plan) instead of the $1.9 million it was expecting. (Id. ¶¶ 97-98.) Further investigation revealed that $279,521.18 of Novak Plan Assets was unaccounted for, although an additional $9,004.04 of Novak Plan Assets were transferred to the NRSP 401(k) a few days later. (Id. ¶¶ 99-100.)

On or around August 17, 2011, Aboudara sent a letter to Hutcheson demanding that he provide Trautmann Maher with a full and proper accounting of Novak Plan Assets on or before August 19, or else she would contact the Department of Labor. (Id. ¶ 101.) Hutcheson responded that he had used the Novak Plan Assets to purchase State of Idaho Economic Development Bonds, which, although they were a "prudent investment," could not be liquidated for at least ninety days.[5] (Id. ¶ 105.) Hutcheson also

_____

[5] Hutcheson also spoke with Plaintiff David J. Novak and told him that he had purchased the economic development bonds at the behest of the Governor of Idaho, and that the bonds could not be liquidated for 180 days. (Id. ¶ 107.) Immediately thereafter, Aboudara and Blue Moon learned that Idaho did not have economic development bonds, contrary to Hutcheson's statements. (Id. ¶ 111.)

sent Aboudara a file purporting to list the assets of each
participant in the Novak Plan as of January 1, 2011. (Id.
¶ 104.)  The Amended Complaint alleges, however, that Hutcheson
falsified this file to conceal his improper use of the G Plan
assets. (Id.) In addition, Hutcheson pressured Aboudara not to
contact the Department of Labor, because an investigation would
purportedly cause a delay in the distribution of retirement
benefits to the Novak Plan participants. (Id. ¶ 106.) Despite
Hutcheson's warning, Aboudara contacted the Department of Labor
about Hutcheson's actions on August 24, 2011. (Id. ¶ 108.)
Meanwhile, unable to confirm the location of the missing assets,
including those belonging to the Novak Plan, Trautmann Maher
independently contacted the Department of Labor on or around
August 25, 2011, to report Hutcheson's suspicious behavior,
before telling Hutcheson that it had done so. (Id. ¶¶ 102-03.)

As of the date of the Amended Complaint, none of the
Defendants had attempted to recover or replace the missing Novak
Plan Assets. (Id. ¶¶ 113, 129-31.)

## III.  **THE BENEFITGUARD MOTION (Doc. 94)**

Plaintiffs allege a number of claims against Defendants
Peterson, Gabbart, and BenefitGuard, including violations of
ERISA §§ 404(a)(1)(A)-(D) (Fifth, Sixth, Seventh, and Eighth
Claims for Relief), violations of ERISA §§ 406(a) and (b)

(Thirteenth Claim for Relief), and violations of ERISA § 405(a) (Eighteenth Claim for Relief).  Plaintiffs also allege a state law claim for Unfair and Deceptive Trade Practices ("UDTP") under N.C. Gen. Stat. § 75-1.1 (Sixteenth Claim for Relief). The BenefitGuard Defendants move only for dismissal of the UDTP claim, arguing that it is preempted by ERISA. (Defs.' Mot. to Dismiss Pls.' Unfair & Deceptive Trade Practices Claim (Doc. 94) at 1.) For the reasons outlined below, the court will grant the motion.

A.    **Specific Facts Relating to the BenefitGuard Defendants**

The Amended Complaint specifically asserts that Defendant Gabbart misrepresented to Aboudara and Blue Moon that the initial transformation of the G Plan into the BenefitGuard Plan was for the purposes of obtaining cost savings and providing more efficient services. (Am. Compl. (Doc. 91) ¶ 52.) Instead, the Amended Complaint asserts:

> The true purpose of the transition from G Plan to BenefitGuard Plan was . . . (1) to conceal material problems in the operation and administration of the G Plan, including the preparation and distribution of erroneous plan and participant statements; (2) to conceal fiduciary breaches, including that throughout 2010, Hutcheson had misappropriated some G Plan assets, including Novak Plan assets; (3) to conceal purported changes in the named fiduciary(ies) of the G Plan; (4) to conceal substantive changes in the Novak plan provisions; (5) to conceal material changes in how the Novak Plan assets would be invested; and (6) to provide changes in the compensation structure and

who benefitted from the compensation paid by or on
behalf of participating employers, including the Novak
Plan.

(Id. ¶ 53.)

The Amended Complaint further asserts that Peterson,
Gabbart, and BenefitGuard (collectively the "BenefitGuard
Defendants") learned of Hutcheson's embezzlement in late 2010
and questioned him about it. (Id. ¶ 55.) Peterson then filed an
IRS Form 5500-SF for the 2010 fiscal year noting that Hutcheson
had "unilaterally transferred assets out of the plan during
2010." (Id. ¶ 56.) Aside from that filing, the BenefitGuard
Defendants did not inform Novak Employer or Blue Moon of
Hutcheson's activities, attempt to recover the funds, or prevent
Hutcheson from continuing to represent himself as a G Plan or
NRSP 401(k) Plan fiduciary. (Id. ¶ 57.)

The Amended Complaint also claims that Peterson, Gabbart,
and BenefitGuard knew that Hutcheson had misappropriated Novak
Plan Assets and that it was therefore impossible for the G Plan
to be administered correctly or in compliance with the law, but
still refrained from disclosing any of this to Plaintiffs. (Id.
at 76.) The Amended Complaint makes the same accusations as to
the BenefitGuard Plan. (Id.) More specifically, the Amended
Complaint claims that the failure of Peterson, Gabbart, and
BenefitGuard to address, disclose, or correct Hutcheson's

- 12 -

actions was in violation of the BenefitGuard and G Plan
governing documents, which require timely distributions to
individuals who qualify, placement of funds into specific mutual
and exchange-traded funds, and accurate accounting. (Id. ¶¶ 80-
85.)

In or around January 2011, Aboudara noticed that the fees
charged to the Novak Plan were higher than expected. (Id. ¶ 65.)
She questioned Gabbart, who told her that a mistake had been
made and promised to provide corrected information, but the
correction was not made and the promised information was never
provided. (Id.)

Around April or May 2011, Peterson informed Hutcheson that
Hutcheson could no longer serve as a trustee or fiduciary of the
BenefitGuard Plan. (Id. ¶ 88.) Even though Peterson apparently
knew that Hutcheson had improperly removed G Plan and
BenefitGuard Plan assets, neither he nor the other BenefitGuard
Defendants took any steps to recover the assets or disclose
Hutcheson's activities to Plaintiffs. (Id. ¶¶ 88-89.) The
BenefitGuard Defendants failed to make an effort to recover the
missing funds, failed to provide information that would assist
the Plaintiffs in recovering the assets, failed to provide a
full accounting of the whereabouts of the assets, and failed to

correct the misleading balance statements on Defendant Aspire's website. (Id. ¶ 112.)

In sum, the Amended Complaint alleges that the BenefitGuard Defendants knew at some point in early 2011 that Hutcheson had improperly converted certain Novak Plan Assets in violation of his fiduciary duties and the law. (Id. ¶¶ 116-17.) Despite this knowledge, the BenefitGuard Defendants did not make a reasonable effort to prevent, remedy, or report Hutcheson's actions. (Id. ¶ 118.) Instead, the BenefitGuard Defendants either attempted to conceal Hutcheson's actions by "causing and allowing" the Aspire website to report inaccurate information regarding Novak Plan Assets, including inflated balance sheets and nonexistent investment vehicles (id. ¶ 119), or they "recklessly or negligently allowed" Aspire to report the inaccurate information. (Id. ¶ 120.)

## B.    ERISA Statutory Scheme[6]

ERISA governs "employee benefit plan[s] . . . established or maintained (1) by any employer engaged in commerce or in any industry or activity affecting commerce; or (2) by any employee organization . . . representing employees engaged in commerce or

---

[6] This subsection also applies to each of the pending motions to dismiss and is incorporated by reference into the other order relating to this case.

in any industry or activity affecting commerce . . . ." 29

U.S.C. § 1003(a). Congress enacted ERISA to:

> [P]rotect interstate commerce and the interests of
> participants in employee benefit plans and their
> beneficiaries, by requiring the disclosure and
> reporting to participants and beneficiaries of
> financial and other information with respect thereto,
> by establishing standards of conduct, responsibility,
> and obligation for fiduciaries of employee benefit
> plans, and by providing for appropriate remedies,
> sanctions, and ready access to the Federal courts.

29 U.S.C. § 1001(b)

To that end, Congress included within ERISA a

"comprehensive civil enforcement scheme" under which plaintiffs

can sue for ERISA violations. ERISA § 502; 29 U.S.C. § 1132; see

Aetna Health Inc. v. Davila, 542 U.S. 200, 208-09 (2004) (citing

Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 54 (1987)). These

provisions are broken down into several subparts. One allows a

participant or beneficiary of an ERISA plan to bring a civil

claim "to recover benefits due to him under the terms of his

plan, to enforce his rights under the terms of the plan, or to

clarify his rights to future benefits under the terms of the

plan." ERISA § 502(a)(1)(B); 29 U.S.C. § 1132(a)(1)(B). A second

allows the Secretary of Labor, a participant, a beneficiary, or

a fiduciary to seek "appropriate relief under ERISA section

1109[,]" which sets forth the consequences for breaches of

fiduciary duties. ERISA § 502(a)(2); 29 U.S.C. § 1132(a)(2). A

third allows a participant, beneficiary, or fiduciary "(A) to enjoin any act or practice which violates any [ERISA] provision . . . or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). And a fourth provides for penalties against plan administrators who fail to provide information about the plan on request, or who fail to provide a valid annual report.  ERISA § 502(c); 29 U.S.C. § 1132(c).[7]

Additionally, in an effort to "avoid a multiplicity of regulation [and] permit the nationally uniform administration of employee benefit plans[,]" New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 655 (1995), Congress also included a preemption provision which supersedes all state laws that "relate to" an ERISA plan. ERISA § 514; see v. Verizon Commc'ns, Inc., 292 F.3d 181, 189-90 (4th Cir. 2002). The preemption clause is "deliberately expansive, and designed to 'establish pension plan regulation as exclusively a federal concern.'" Pilot Life Ins., 481 U.S. at 46

---

[7] Plaintiffs Blue Moon Fiduciary and David J. Novak, D.D.S., P.A., sue in their capacities as fiduciaries of the G Plan, BenefitGuard Plan, and NRSP 401(k), while Plaintiff David J. Novak sues as a participant in all three plans. (Am. Compl. (Doc. 91) at 2.) As the civil enforcement mechanisms indicate, Plaintiffs' suit in these capacities is appropriate.

(quoting _Alessi v. Raybestos-Manhattan, Inc._, 451 U.S. 504, 523

(1981)).  In recognition thereof, the Supreme Court has "given

[the phrase "relate[s] to"] its broad common-sense meaning, such

that a state law 'relate[s] to' a benefit plan . . . 'if it has

connection with or reference to such a plan.'" _Id._ at 47

(quoting _Metropolitan Life Ins. Co. v. Massachusetts_, 471 U.S.

724, 739 (1985)); _see also_ _Griggs v. E.I. Dupont de Nemours &_

_Co.,_ 237 F.3d 371 (4th Cir. 2001) (Thus, even "a state law of

general application, with only an indirect effect on a pension

plan, may nevertheless be considered 'relate[d] to' that plan

for preemption purposes." (citing _Smith v. Dunham-Bush, Inc.,_

959 F.2d 6, 9 (2nd Cir. 1992))).

In order to give practical effect to these provisions, the

Supreme Court has identified three (non-exclusive) categories of

state law subject to ERISA preemption. _See_ _Travelers Ins._, 514

U.S. at 658-59. These categories are: (1) laws that mandate

employee benefit structures or their administration, (2) laws

that bind employers or plan administrators to particular choices

or preclude uniform administrative practices, and (3) laws that

provide alternative enforcement mechanisms to ERISA's civil

enforcement provisions.[8] Id.; see also Darcangelo, 292 F.3d at

190; Coyne & Delany Co. v. Selman, 98 F.3d 1457, 1468 (4th Cir.

1996).

Only the third category, which refers to ERISA's civil

enforcement mechanisms, is at issue here. "A state claim is an

alternative enforcement mechanism for ERISA rights if the state

claim could be brought as an enforcement action under § 502."

Darcangelo, 292 F.3d at 190-91. "[A]ny state-law cause of action

that duplicates, supplements, or supplants the ERISA civil

enforcement remedy conflicts with the clear congressional intent

---

[8] The first category refers to laws that "mandate the
structure or content of the ERISA plan or how it is
administered." Darcangelo, 292 F.3d at 190.  The second category
refers to laws that "regulate the structure or process of plan
administration . . . [F]or example, . . . [laws] that would
dictate how a plan administrator must process benefit
information, dictate who may have access to such information, or
limit the ability of the plan administrator to investigate
benefit claims." Id.

to make the ERISA remedy exclusive and is therefore preempted."[9]
Aetna Health Inc. v. Davila, 542 U.S. 200, 209 (2004) (citing
Pilot Life Ins. Co., 481 U.S. at 56); see Griggs, 237 F.3d at
378.

---

[9] For instance, claims seeking to obtain benefits due under
a plan are routinely preempted. See, e.g., Pilot Life Ins. Co.,
481 U.S. at 48 ("The common law causes of action raised in [the
beneficiary's] complaint, each based on alleged improper
processing of a claim for benefits under an employee benefit
plan, undoubtedly meet the criteria for pre-emption under
[ERISA's preemption clause]."); Ingersoll-Rand Co. v. McClendon,
498 U.S. 133, 135 (1990) (preempting a state common law claim
that an employee was unlawfully discharged to prevent his
attainment of benefits under a plan covered by ERISA).

Courts making the preemption determination have also
considered the state law claim's impact on ERISA's objectives,
whether the claim "implicates the relations among traditional
ERISA plan entities," and whether the claim requires excessive
inquiry into the plan's particulars or controlling documents.
See LeBlanc v. Cahill, 153 F.3d 134, 147-48 (4th Cir. 1998) ("We
hold that allowing [the plaintiffs'] common law fraud claim to
go forward . . . does not threaten ERISA's objectives of
protecting the interests of participants in employee benefit
plans and their beneficiaries by establishing standards of
conduct, responsibility, and obligations for fiduciaries and by
providing for appropriate remedies, sanctions, and ready access
to the federal courts."); Augustson v. Bank of America, 864 F.
Supp. 2d 422, 435-36 (E.D.N.C. 2012) ("ERISA does not . . .
preempt generally applicable state-law claims that do not
implicate relations between the traditional principals of an
ERISA plan (the employer, the plan, the plan fiduciaries, and
the plan beneficiaries)." (citing Coyne & Delany, 98 F.3d at
1469)); Ingersoll-Rand, 498 U.S. at 140 ("Thus, in order to
prevail, a plaintiff must plead, and the court must find, that
an ERISA plan exists and the employer had a pension-defeating
motive in terminating the employment. Because the court's
inquiry must be directed to the plan, this judicially created
cause of action 'relate[s] to' an ERISA plan.").)

However, realizing "that an expansive interpretation of the phrase 'relate to' would mean that 'for all practical purposes preemption would never run its course[,]'" Darcangelo, 292 F.3d at 190 (citing Travelers Ins., 514 U.S. at 655), the Supreme Court has cautioned that "[s]ome state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 100 n.21 (1983). For example, ERISA's preemption clause does not reach state law claims that (1) "[do] not undermine the congressional policies that underlie ERISA" (e.g., protecting interests of plan participants and beneficiaries and establishing fiduciary standards of conduct), Coyne v. Delany, 98 F.3d at 1470; and (2) are not based on "'traditional state-based laws of general applicability [that do not] implicate the relations among the traditional ERISA plan entities,' including the principals, the employer, the plan, the plan fiduciaries and the beneficiaries." Id. at 1469 (quoting Custer v. Sweeney, 89 F.3d 1156, 1167 (4th Cir. 1996)).

It is clear, therefore, that a court's preemption determination does not turn on the state law claim's label, but on its substance. This court must look at a combination of factors in making the preemption decision, including the theory

of the claim in conjunction with the facts alleged in
Plaintiffs' Amended Complaint, and ERISA's objectives and the
purposes underlying the preemption clause.

###    C.    ERISA Preemption Analysis

The Amended Complaint alleges that the BenefitGuard
Defendants violated North Carolina's UDTP statute "by hiding and
facilitating the wrongful conduct occurring in the
administration of the G Plan," specifically by:

a.    Creating a new plan, the BenefitGuard Plan.

b.    Inducing Plaintiffs to move the Novak Plan assets
from the G Plan to the BenefitGuard Plan by
falsely representing that the change to the
BenefitGuard Plan was made simply to provide the
participating employers with better, more
efficient services and cost savings.

c.    Failing to disclose to Plaintiffs: (1) that the
transition from the G Plan to the BenefitGuard
Plan was really the result of mismanagement of
the G Plan, (2) that there would be changes in
the ownership of the plan sponsor, (3) that there
would be changes in the named fiduciaries, (4)
that there would be substantive changes in the
retirement plan provisions, (5) that there would
be changes in how Novak Plan assets would be
invested, (6) that a dispute existed with
Hutcheson, (7) that Hutcheson would have a
diminished role as a fiduciary, (8) that plan
assets had been improperly taken from the G Plan
and unaccounted for, or (9) that there would be
disruption in the normal operation or
administration of the G Plan.

(Am. Compl. (Doc. 91) ¶ 219.)

The BenefitGuard Defendants primarily argue that the UDTP claim "is directed towards fiduciary management occurring in the administration of an ERISA plan" and is therefore "premised on the same factual allegations on which Plaintiffs base their claims under ERISA." (BenefitGuard Defs.' Mem. in Supp. of Mot. to Dismiss (Doc. 95) at 7.) Plaintiffs, on the other hand, contend that the UDTP claim is based on non-fiduciary actions "entirely unrelated to and outside the scope of [the BenefitGuard Defendants'] duties under the plan or in carrying out the terms of the plan." (Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss ("Pls.' BenefitGuard Resp.") (Doc. 108) at 7.) The unlawful conduct, according to Plaintiffs, is not that the BenefitGuard Defendants "improperly denied a claim for benefits or improperly invested or managed the assets that remain in the G Plan or the BenefitGuard Plan [in violation of their fiduciary duties]. . . . [but] that the BenefitGuard Defendants induced the Plaintiffs to transition the Novak Plan Assets to the BenefitGuard Plan under false pretenses." (Id. at 11.) Because the Fourth Circuit has held that claims seeking "to enforce [a plan administrator's] fiduciary duties . . . constitute alternative enforcement mechanisms to § 502 and . . . therefore relate to the ERISA plan[,]" Darcangelo, 292 F.3d at 192, the issue this court must decide is whether Plaintiffs' UDTP claim

against the BenefitGuard Defendants is simply a claim for breach

of fiduciary duty masquerading as a non-preempted state law

cause of action. See Wilmington Shipping Co. v. New England Life

Ins. Co, 496 F.3d 326, 344 (4th Cir. 2007) ("Because

[Plaintiffs'] state-law claims merely repackage [their] ERISA

claim, they are preempted by ERISA.").

"[T]he concept of a fiduciary under ERISA is broad[] . . ."

v. Pan Am. Life Ins. Co., 12 F.3d 410, 418 n.3 (4th Cir. 1993),

and is not an "all-or-nothing" proposition. Darcangelo, 292 F.3d

at 192. It includes not only those "named [as fiduciaries] in

the plan instrument, or who, pursuant to a procedure specified

in the plan, [are] identified as . . . fiduciar[ies], but any

individual who de facto performs specified discretionary

functions with respect to the management, assets, or

administration of a plan."[10] Sweeney, 89 F.3d at 1161 (citing 29

U.S.C. § 1102(a)(2)). In other words, "[t]he same entity may

function as an ERISA fiduciary in some contexts but not in

others." Darcangelo, 292 F.3d at 192. In determining whether a

---

[10] ERISA's "functional fiduciary" language provides that a
person is a fiduciary "to the extent (i) he exercises any
discretionary authority or discretionary control respecting
management of such plan or exercises any authority or control
respecting management or disposition of its assets, . . . or
(iii) he has any discretionary authority or discretionary
responsibility in the administration of such plan." Wilmington,
496 F.3d at 343 (citing 29 U.S.C. § 1002(21)(A)).

defendant was "performing a fiduciary function" at the relevant time, a court must "consider (1) whether the acts in question were like traditional fiduciary decisions, which are typically decisions about managing assets and distributing property to beneficiaries, and (2) whether treating these acts as fiduciary decisions under ERISA would lead to the undesirable federalization of large swaths of state law." Id. at 193 (internal citations and quotation marks omitted).

Plaintiffs argue that the "conduct [underlying the UDTP claim] was entirely unrelated to and outside the scope of their duties under the plan[,]" and that the BenefitGuard Defendants were therefore not acting as fiduciaries when they enticed Plaintiffs to join the BenefitGuard Plan. (Pls.' BenefitGuard Resp. (Doc. 108) at 7 (citing Darcangelo, 292 F.3d at 193).) They conclude that since the UDTP claim does not seek to enforce any fiduciary duties, the UDTP claim should not be preempted. Id. But having reviewed the relevant paragraphs in the Amended Complaint, this court finds that Plaintiffs' argument contradicts the assertions set forth in the claims against the BenefitGuard Defendants. Rather than alleging distinct non-fiduciary conduct to support their UDTP claim, Plaintiffs simply repeat the same factual bases they use to support their claims for breach of ERISA fiduciary duties. (Compare Am. Compl. (Doc.

- 24 -

91) ¶ 219 (alleging that the BenefitGuard Defendants violated
the UDTP statute by, _inter alia_, creating the BenefitGuard Plan,
falsely inducing Plaintiffs to switch to that plan, and failing
to disclose Hutcheson's embezzlement or the resulting
substantive changes in plan structure), _with_ _id._ ¶ 172 (alleging
that the BenefitGuard Defendants breached their fiduciary duties
under ERISA § 404(a)(1)(B) by, _inter_ _alia_, "engaging in
activities, including the transition from G Plan to the
BenefitGuard Plan, intended to conceal Mr. Hutcheson's
conversion and embezzlement of Novak Plan Assets"), _and_ _id._
¶ 182 (alleging that the BenefitGuard Defendants breached their
fiduciary duties under ERISA § 404(a)(1)(D) by, _inter_ _alia_,
"[p]urportedly renaming the G Plan as the BenefitGuard Plan but
erroneously converting the G Plan from a plan in which
investments were made by investment fiduciaries to a plan in
which investment decisions were made by participants as governed

by ERISA Section 404(c)").)[11]

Taking the facts alleged in the Amended Complaint as true, this court finds that Plaintiffs have alleged that the BenefitGuard Defendants <u>were</u> acting in a fiduciary capacity at the time they enticed Novak Employer to transition from the G Plan to the BenefitGuard Plan, their <u>post hoc</u> arguments to the contrary notwithstanding.[12] Stated differently, Plaintiffs frame the transition from the G Plan to the BenefitGuard Plan as one of many alleged overarching breaches of fiduciary duty – namely refusal to disclose Hutcheson's activities, active concealment of Hutcheson's embezzlement, and refusal to recover the lost

---

[11] <u>See also</u> <u>Wilmington</u>, 496 F.3d at 342 ("Appellants' state-law claims against NEL consist of claims under North Carolina law for unfair and deceptive trade practices, breach of contract, negligent misrepresentation, and constructive fraud. Each of these claims incorporates the allegations from Ruffin's ERISA claim. Appellants also set forth independent factual allegations to support each of the claims, but these allegations largely, if not completely, restate the general allegations underlying Ruffin's ERISA claim.").

[12] Any other interpretation of the Amended Complaint is untenable. Plaintiffs would have this court find either (1) that the BenefitGuard Defendants' actions were simultaneously non-fiduciary in nature <u>and</u> breaches of fiduciary duty, or (2) that, somewhere in the midst of their alleged ongoing breaches of fiduciary duty (e.g., "[f]ailing to recover, or take any meaningful action to recover the Novak Plan assets originally attributable to the G Plan" (Am. Compl. (Doc. 91) ¶ 167)), the BenefitGuard Defendants engaged in brief but distinct non-fiduciary deception amounting to an unfair and deceptive trade practice. This court is not disposed to draw either of these conclusions, particularly in light of the overlapping factual bases underlying both Plaintiffs' ERISA and UDTP claims.

assets. Because the Fourth Circuit has previously concluded that state law claims which "merely repackage [a plaintiff's] ERISA claim[s]" are preempted because they clearly "relate to" an ERISA plan, Wilmington, 496 F.3d at 344, and because Plaintiffs have simply repackaged their ERISA claims for breach of fiduciary duty under the UDTP label, the UDTP claim is preempted.

Plaintiffs' cited case law does not demand a different result. Coyne & Delany, for instance, held that ERISA did not preempt a professional malpractice claim against non-fiduciary defendants in their capacity as insurance professionals, 98 F.3d at 1460, but specifically remarked that "Delany is not a beneficiary . . . . Thus, it is necessarily the case that Delany's common law action cannot be considered an 'alternate enforcement mechanism [under ERISA.]" Id. at 1471. Likewise, LeBlanc v. Cahill, 153 F.3d 134 (4th Cir. 1998) involved a suit by an ERISA pension plan "against a third party who [was]

neither a fiduciary nor a party in interest with respect to the

plan . . . ." Id. at 138.[13]

Plaintiffs also argue that, as a general rule, claims of

fraudulent inducement to join or create an ERISA plan are not

preempted, citing Smith v. Cohen Benefit Grp. Inc., 851 F. Supp.

210 (M.D.N.C. 1993) and All Risks, Ltd. v. Equitable Life

Assurance Society, 931 F. Supp. 409 (D. Md. 1996). (Pls.'

BenefitGuard Resp. (Doc. 108) at 10.)  However, these cases are

inapposite, because, unlike the Smith and All Risks plaintiffs,

the BenefitGuard Defendants already had a fiduciary obligation

towards the Novak Plan Assets before the alleged fraudulent

inducement took place. (See, e.g., Am. Compl. (Doc. 91) ¶ 26

_____

[13] Darcangelo, which Plaintiff also cited in support of its
argument, is inapposite to this case. There, a plaintiff sued
the ERISA plan administrator for divulging her private medical
information to her employer so the employer could create a
preemptive and pretextual defense to a Title VII claim.
Darcangelo, 292 F.3d at 186. The plaintiff alleged five state
law causes of action: breach of contract, invasion of privacy,
negligence, and violations of Maryland's medical records
confidentiality and UDTP statutes. Id. The district court
dismissed each claim as preempted by ERISA, but the Fourth
Circuit reversed as to all claims except breach of contract. Id.
The court attempted to determine "whether the conduct complained
of in the plaintiff's complaint [was] conduct undertaken by [the
defendant] in the performance of its plan administration
fiduciary duties for an ERISA plan[,]" but found that this
question could not be answered at the motion to dismiss stage
because facts in the complaint were insufficient. Id. at 189
(internal citations omitted). Therefore, the court refrained
from ruling on the merits of the preemption argument. Here, by
contrast, Plaintiffs have alleged sufficient facts for this
court to rule on the preemption question.

("Defendants . . . Gabbart, Peterson, and BenefitGuard have or had a fiduciary relationship with respect to the G Plan and BenefitGuard Plan . . . during times relevant to this action because each was either named as a fiduciary and/or has exercised discretionary authority or control over the management of the G Plan and BenefitGuard Plan and/or the assets and administration of the G Plan and BenefitGuard Plan.").) This scenario contrasts with both <u>Smith</u> and <u>All Risks</u>, in which the defendants had no fiduciary obligations to the plaintiffs prior to fraudulently inducing them to join an ERISA-covered plan. <u>See Smith</u>, 851 F. Supp. at 214 ("At the time of the alleged misrepresentation, Plaintiffs were not participants or beneficiaries and Defendant was not a plan fiduciary,"); <u>All Risks</u>, 931 F. Supp. at 412 (describing the defendant's initial

sales pitch regarding the establishment of a defined contribution employee benefit plan).[14]

The fact that the BenefitGuard Defendants already had a fiduciary relationship with Plaintiffs before encouraging Plaintiffs to transition to the BenefitGuard Plan, as well as Plaintiffs' use of the same factual bases to support both their ERISA claims for breach of fiduciary duty and their UTDP claim, brings this case "near the heartland of ERISA's coverage." Wilmington, 496 F.3d at 343. Therefore, taking the facts alleged in the Amended Complaint as true, this court finds that Plaintiffs' UDTP claim is properly characterized as a claim against fiduciary beneficiaries to enforce fiduciary obligations, and that it operates as an alternative enforcement mechanism to ERISA § 502. Plaintiffs UDTP claim (Sixteenth Cause

---

[14] This court also notes that Plaintiffs' proposed general rule – that claims of fraudulent inducement, as a class, are not preempted by ERISA – ignores the subtleties of the ERISA preemption analysis. As discussed earlier, the touchstone inquiry is not the claim's label, but whether it "relates to" an ERISA plan. ERISA § 514. Claims like this one, which arise after an ERISA plan exists, where the alleged bad actors already have fiduciary obligations towards the plan, and where the damages consist of funds that would otherwise have been in the plan coffers, clearly "relate to" the ERISA plan at issue and are preempted. In Smith, the alleged fraud occurred prior to the existence of any plan, Smith, 851 F. Supp. at 211, and the damages were to an individual plaintiff who expended funds on medical care in reliance on the false statement, not to the funds in the plan's custody. Id. at 211-12.

of Action) against Defendants Peterson, Gabbart, and BenefitGuard will be dismissed.

**IV.** **CONCLUSION**

For the foregoing reasons, **IT IS ORDERED** that the Motion to Dismiss Plaintiffs' Unfair and Deceptive Trade Practices Claim filed by Defendants Aaron Gabbart, Daniel S. Peterson, and BenefitGuard, LLC (Doc. 94) is **GRANTED.**

This the 14th day of August, 2014.

_____
United States District Judge